UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

UNITED STATES OF AMERICA *ex rel.*
MATTHEW THOMAS, JR.,

               Plaintiff-Relator,

-v-

PREMIER HOME HEALTH CARE
SERVICES, INC.,
               Defendant.

19-CV-11800 (JPO)

MEMORANDUM & ORDER

---

J. PAUL OETKEN, District Judge:

    Plaintiff-Relator Matthew Thomas, Jr. on behalf of the federal government and seven states, brings this action against Defendant Premier Home Health Care, Inc. ("Premier") under the False Claims Act, 31 U.S.C. §§ 3729 *et seq.* (the "FCA") and analogous state false claims act statutes. Thomas alleges that Premier unlawfully billed state and federal Medicaid programs for personal care services that were not rendered, improperly obtained and failed to refund overpayments from state Medicaid programs, and unlawfully retaliated against and terminated Thomas for raising these violations with Premier senior management. The United States government and the governments of all named states—Connecticut, Florida, Illinois, Massachusetts, New Jersey, New York, and North Carolina—declined to intervene in this action.

    Now before the Court is Premier's motion to dismiss Thomas's First Amended Complaint (the "Amended Complaint"). (ECF No. 20.) For the reasons that follow, the Court grants Premier's motion in its entirety.

**I.    Background**

    The following facts are taken from the Amended Complaint and are presumed true for the purposes of this motion. *Fink v. Time Warner Cable*, 714 F.3d 739, 740-41 (2d Cir. 2013).

Premier is a for-profit New York corporation that provides in-home healthcare and personal care services to a variety of patient populations, including Medicaid beneficiaries and Managed Medicaid members. (ECF No. 17 ("Am. Compl.") ¶ 51.) Thomas served as Premier's Director of Quality Compliance from August 27, 2018, to April 15, 2019. (Am. Compl. ¶¶ 130, 140.) During this time, he discovered that Premier was failing to meet personnel and clinical compliance requirements, which may have affected Premier's ability to bill Medicaid properly for health-related services. (*Id.* ¶¶ 131, 132.) For example, Thomas observed that Premier failed to obtain valid physician orders for service authorizations, neglected to update patient medical profiles and plans of care, and did not conduct the required orientation training for home health aides. (*Id.* ¶¶ 110, 111.) Thomas identified similar compliance issues at facilities in North Carolina, Illinois, and Massachusetts. (*Id.* ¶ 137.)

Upon discovering these compliance failures, Thomas promptly reported them to Premier senior management, including his direct supervisor and Corporate Compliance & Privacy Officer, Salvatrice Serio-Scerbo; Chief Operating Officer, Gregory Turchan; and General Counsel, Cesar Perez. (*Id.* ¶ 131.) He advised that the deficiencies required disclosure to Medicaid and repayment of any overcharges. (*Id.*) Thomas reiterated these concerns at multiple senior management meetings, warning that the clinical deficiencies "were a massive issue and needed to be corrected immediately." (*Id.* ¶¶ 135, 138.) At one quarterly compliance committee meeting, Serio-Scerbo presented a PowerPoint titled "Findings-Trends-Corrections," which reflected clinical deficiencies of the kind Thomas had identified, including unsigned orders, missing documentation, and late or missing visits. (*Id.* ¶ 124.) Nevertheless, according to Thomas, Premier "defiantly failed to correct compliance deficiencies and make Medicaid refunds." (*Id.* ¶ 127.) As a result, Thomas sent "decisively worded emails" to, among others,

Chief Nursing Officer Celestina Cruz, stressing that the problems he had raised needed to be remedied without delay, including by hiring additional nurses to retroactively address the outstanding compliance issues. (*Id.* ¶ 136.)

On or about April 11, 2019, Thomas met with Serio-Scerbo and Premier's Chief Human Resources Officer Jeannie O'Sullivan. (*Id.* ¶ 139.) At that meeting, O'Sullivan allegedly "criticized [Thomas] in a demeaning manner for transmitting strongly worded emails to [Premier's] officers about the need to remedy compliance deficiencies and address billing issues." (*Id.*) Four days later, on April 15, 2019, Premier terminated Thomas's employment. (*Id.* ¶ 140.) At the time of his termination, Thomas was told that his "emails about the need to fix compliance and billing issues were too strongly worded" and that Premier "could save money by replacing" him with a less costly employee. (*Id.*)

## II.    Legal Standards

### A.    Motions to Dismiss Under Federal Rule of Civil Procedure 12(b)(6)

When considering a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a court must "draw all reasonable inferences in Plaintiffs' favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly give rise to an entitlement to relief." *Faber v. Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (quotation marks omitted). A plaintiff's claim survives a motion to dismiss under 12(b)(6) if it alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("While *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge plaintiffs' claims across the line from conceivable to plausible." (quotation marks and brackets omitted)).

That said, a court is "not bound to accept conclusory allegations or legal conclusions masquerading as factual conclusions." *Rolon v. Henneman*, 517 F.3d 140, 149 (2d Cir. 2008) (citation and quotation marks omitted); *see also Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) ("[A]lthough a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." (quotation marks and brackets omitted)). Moreover, "[w]here a complaint pleads facts that are 'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of entitlement to relief.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (certain quotations omitted) (quoting *Twombly*, 550 U.S. at 557).

    **B.**    **Actions Arising Under the False Claims Act**

The FCA prohibits false claims related to government funds. *See* 31 U.S.C. § 3729 *et seq*. Individuals are authorized to bring a civil action for a violation of the FCA for the complaining person and for the United States government. *United States ex rel. Kreindler & Kreindler v. United Tech. Corp.*, 985 F.2d 1148, 1153 (2d Cir. 1993) (citing 31 U.S.C. § 3730(b)(1) (1988)). In particular, a party, often termed a "relator," *Kreindler*, 985 F.2d at 1153, may commence an action by filing a *qui tam* complaint, 31 U.S.C. § 3730(b)(1).

"The action is brought in the name of the government, and the government may either intervene and prosecute the action, or allow the original plaintiff—the *qui tam* relator—to proceed with the suit under § 3730(b)(4)(B)." *Kreindler*, 985 F.2d at 1153 (citations omitted). "While relators indisputably have a stake in the outcome of [FCA] *qui tam* cases that they initiate, 'the Government remains the real party in interest in any such action.'" *United States ex rel. Mergent Servs. v. Flaherty*, 540 F.3d 89, 93 (2d Cir. 2008) (quoting *Minotti v. Lensink*, 895

F.2d 100, 104 (2d Cir. 1990)). "Whether or not the government joins in the action, the relator is entitled to a portion of the proceeds if the prosecution is successful." *Kreindler*, 985 F.2d at 1153.

### 1. Direct and Reverse False Claims

In this case, Thomas alleges three theories of liability arising under the FCA: two direct false claims pursuant to 31 U.S.C. §§ 3729(a)(1)(A) and 3729(a)(1)(B), and a "reverse" false claim pursuant to § 3729(a)(1)(G).

To succeed in alleging a direct false claim under §§ 3729(a)(1)(A) and (B), a plaintiff-relator must show that the defendant "(1) made a claim, (2) to the United States Government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment from the federal treasury." *Coyne v. Amgen, Inc.*, 717 F. App'x 26, 28 (2d Cir. 2017) (summary order) (quoting *United States ex rel. Kirk v. Schindler Elevator Corp.*, 601 F.3d 94, 113 (2d Cir. 2010), *rev'd on other grounds*, 563 U.S. 401 (2011)); *see* 31 U.S.C. § 3729(a)(1). Simply put, a direct false claim involves a request for government funds knowingly made under false pretenses.

A reverse false claim involves a false or fraudulent misrepresentation to the government to avoid complying with a payment obligation. *See* 31 U.S.C. § 3729(a)(1)(G). To state a claim under this theory, a plaintiff must show "(1) proof that the defendant made a false record or statement (2) at a time that the defendant had a presently-existing obligation to the government— a duty to pay money or property." *United States ex rel. Kester v. Novartis Pharm. Corp.*, 43 F. Supp. 3d 332, 367-68 (S.D.N.Y. 2014) (quotation marks omitted). "Subsection (a)(1)(G) is referred to as the 'reverse false claims' provision because it covers claims of money *owed to* the government, rather than payments *made by* the government." *Id.* at 368 (quotation marks omitted).

### 2. Federal Rule of Civil Procedure 9(b) and FCA Claims

"*Qui tam* complaints filed under the FCA, because they are claims of fraud, are subject to Rule 9(b)." *United States ex rel. Chorches for Bankr. Est. of Fabula v. Am. Med. Response, Inc.*, 865 F.3d 71, 81 (2d Cir. 2017). Federal Rule of Civil Procedure 9(b) generally requires that when a party alleges fraud, that party "must state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). Particularity, in turn, requires that a complaint "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent." *Chorches*, 865 F.3d at 81.

FCA claims must also "allege the particulars of the false claims themselves." *United States ex rel. Lee v. N. Adult Daily Health Care Ctr.*, 205 F. Supp. 3d 276, 288 (E.D.N.Y. 2016) (quotation marks omitted); *see also United States ex rel. Forcier v. Comput. Scis. Corp.*, 183 F. Supp. 3d 510, 520-21 (S.D.N.Y. 2016) (explaining the same). Although this often requires a plaintiff to "provide details of actual bills or invoices submitted to the government," *see Chorches*, 865 F.3d at 93, a plaintiff may allege that fraudulent claims were submitted in violation of the FCA based solely on information and belief so long as (1) the plaintiff "make[s] plausible allegations that the bills or invoices actually submitted to the government were uniquely within the defendant's knowledge and control," and (2) the plaintiff "adduce[s] specific facts supporting a strong inference of fraud," *United States ex rel. Gelbman v. City of New York*, 790 F. App'x 244, 248 (2d Cir. 2019) (summary order) (brackets omitted). However, "while Rule 9(b) permits scienter to be demonstrated by inference, this 'must not be mistaken for license to base claims of fraud on speculation and conclusory allegations.'" *O'Brien v. Nat'l Prop.*

*Analysts Partners*, 936 F.2d 674, 676 (2d Cir. 1991) (quoting *Wexner v. First Manhattan Co.*, 902 F.2d 169, 172 (2d Cir. 1990)).

**III.    Discussion**

Thomas alleges claims for (1) fraud in violation of 31 U.S.C. §§ 3729(a)(1)(A), (B), and (G) along with identical claims under the FCA's state analogs; and (2) retaliation in violation of 31 U.S.C. § 3730(h)(1) along with identical claims under the FCA's state analogs.

**A.    Alleged False Claims Under 31 U.S.C. §§ 3729(a)(1)(A) and (B)**

Under the FCA, Thomas must allege that Premier "(1) made a claim, (2) to the United States Government, (3) that is false or fraudulent, (4) knowing of its falsity, and (5) seeking payment from the federal treasury." *Coyne*, 717 F. App'x at 28 (summary order) (quoting *Schindler Elevator Corp.*, 601 F.3d at 113). The parties do not dispute that Premier submitted claims to the government seeking payment. The dispute centers on whether those claims were false, whether Premier knew of their falsity, and whether Thomas's allegations sufficiently allege materiality. Because Thomas fails to plead falsity—even under the relaxed standard governing allegations of FCA violations based solely on information and belief—this Court need not reach scienter or materiality.

Thomas "does not dispute that he must satisfy Rule 9(b) pleading requirements for his fraud-based FCA claims." (ECF No. 24 ("Opp.") at 17.) At the same time, the Amended Complaint alleges that he lacked access to Premier's bills or reimbursement claims. (Am. Compl. ¶¶ 49, 50.) In such circumstances, a plaintiff may proceed under the more relaxed pleading standard, which requires (1) plausible allegations that the bills or invoices submitted to the government were uniquely within the defendant's knowledge and control, and (2) specific facts supporting a strong inference of fraud. *Gelbman*, 790 F. App'x at 248. Here, the Amended

7

Complaint satisfies neither requirement. Accordingly, Thomas has not met the relaxed pleading standard.

Thomas fails to demonstrate that the bills or invoices Premier submitted to the government were "uniquely" or "peculiarly" within Premier's knowledge and control. *Id.* The Amended Complaint merely alleges that he lacked access to Premier's "Medicare and Medicaid claims, billing or revenue records or the details of their contents" (Am. Compl. ¶ 49), and that such records "were, and remain, peculiarly within [Premier's] care, custody and control" (*Id.* ¶ 50). These conclusory statements fall short of alleging "facts establishing specific reasons why such information regarding the particular bills that were submitted for reimbursement is peculiarly within" Premier's knowledge. *Chorches*, 865 F.3d at 82 (quotation marks omitted). By contrast, in *Chorches*, the Second Circuit held that the relator adequately alleged facts showing that billing records were within the defendant's control. *Id.* There, the relator alleged that ambulance personnel, including himself, "were prohibited from making unauthorized entrances into the administrative building . . . where all the billing was taking place." *Id.* (quotation marks omitted). Ambulance personnel were also largely excluded from participating in the employer's billing procedures. *Id.* On that basis, the court found it plausible that the defendant's procedures "made it virtually impossible for most employees to have access to all of the information necessary to certify on personal knowledge both that a particular invoice was submitted for payment and that the facts stated to justify the invoice were false." *Id.*

Thomas provides no comparable details regarding his "reasons for not having personal knowledge of the contents" of the alleged false claims. *Gelbman*, 790 F. App'x at 249. This lack of specificity is fatal to his claims. *See United States ex rel. Aharon v. Nuvance Health, Inc.*, No. 24-CV-524, 2025 WL 968583, at *13 (S.D.N.Y. Mar. 31, 2025).

8

Thomas's brief in opposition contends that his allegation of lacking access to Premier's billing records is not merely conclusory. He asserts that, "based on his job title, responsibilities and the actions he undertook in the compliance department—not billing department—[it] is a reasonable assertion and conclusion" that he never had access to Premier's billing records. (Opp. at 18.) This argument is unpersuasive, as Thomas provides no "specific factual allegations" demonstrating that he was unable to obtain billing details. *Chorches*, 865 F.3d at 83. To the contrary, Thomas's role in the compliance department—which required him to interview Premier's billing team and review billing processes (Opp. at 16, 18)—suggests that he had at least some access to specific information about allegedly false claims. *See United States ex rel. O'Toole v. Community Living Corp.*, No. 17-CV-4007, 2020 WL 2512099, at *9 (S.D.N.Y. May 14, 2020) (concluding that the relator's position and access to certain records indicated that the allegedly false billing records were not peculiarly within the company's knowledge). Accordingly, Thomas fails to satisfy even the relaxed pleading standard for FCA claims based on information and belief, as he does not plausibly allege that the relevant records were uniquely within Premier's control.

The Amended Complaint similarly fails to "adduce specific facts supporting a strong inference of fraud," as required under the second prong of the more relaxed Rule 9(b) pleading standard. *Chorches*, 865 F.3d at 83 (quotation marks omitted). Specifically, an FCA plaintiff must allege that the defendant "submit[ed] or cause[d] the submission of a claim for payment to the government, and the claim for payment must itself be false or fraudulent." *Id.* (quoting *Hagerty ex rel. U.S. v. Cyberonics Inc.*, 844 F.3d 26, 31 (1st Cir. 2016)). The Amended Complaint falls short of satisfying this standard.

Thomas does not "put forth particularized allegations of a scheme to falsify records or describe specific instances of the implementation of that scheme." *Gelbman*, 790 F. App'x at 248 (quotation marks and brackets omitted). Instead, he offers only general allegations of Premier's compliance deficiencies, including issues with new employee onboarding and annual review processes (Am. Compl. ¶ 36), and inadequate credentials, training, and supervision of nursing and home health aide staff (*Id.* ¶ 39). Although Thomas identifies specific regulatory shortcomings at Premier's Bronx site—such as that twenty-two percent of forms were missing physician signatures, that fifteen percent of forms were missing plans of treatment, and that eleven percent of forms were missing start-of-care dates (*Id.* ¶ 113)—allegations that a company billed the government "as if [it] had been in full compliance" with contractual requirements do not create a strong inference that a factually false invoice was submitted. *United States ex rel. Hussain v. CDM Smith, Inc.*, No. 14-CV-9107, 2017 WL 4326523, at *2, *6 (S.D.N.Y. Sept. 27, 2017); *see also Universal Health Servs., Inc. v. United States ex rel. Escobar*, 579 U.S. 176, 194 (2016) ("The False Claims Act is not an all-purpose antifraud statute, or a vehicle for punishing garden-variety breaches of contract or regulatory violations." (quotation marks and citation omitted)).

Thomas attempts to remedy this deficiency by asserting that "[i]f [his] allegations of the vast and pervasive scheme [in the Amended Complaint] . . . are born[e] out, then the only reasonable conclusion one can come to is that [Premier] regularly and systematically submitted false and fraudulent claims to the government insurance programs" across its approximately thirty-four facilities. (Opp. at 19; Am. Compl. ¶ 53.) But the Court is not tasked with drawing such inferences. The Amended Complaint itself must "put[] forth particularized allegations of a scheme to falsify records" or describe "specific instances of the implementation of that scheme."

*Chorches*, 865 F.3d at 84 (finding sufficient particularity where the complaint described instances in which the plaintiff was instructed to falsify records); *see also Pilat v. Amedisys, Inc.*, No. 23-566, 2024 WL 177990, at *3 (2d Cir. Jan. 17, 2024) (holding that a strong inference of fraud existed where the relator identified specific cases of clinicians being instructed to falsify patient information or recommend unnecessary treatment). Here, by contrast, "we are left to speculate as to the specific design and implementation of a scheme that purportedly defrauded the federal government." *Gelbman*, 790 F. App'x at 249.

Ultimately, Thomas provides no explanation for his lack of personal knowledge regarding the content of Premier's bills submitted to the federal government or the contours of Premier's alleged scheme to defraud it. His FCA claims therefore rest on "speculation and conclusory allegations." *Chorches*, 865 F.3d at 86 (quotation marks omitted). Accordingly, the Court dismisses them for failure to satisfy Rule 9(b)'s particularity requirement. Because Thomas has failed to allege falsity, his FCA claims under 31 U.S.C. §§ 3729(a)(1)(A) and (B) cannot stand.

B.   **Alleged Reverse False Claims Under 31 U.S.C. § 3729(a)(1)(G)**

Section 3729(a)(1)(G) prohibits a person from "knowingly mak[ing], us[ing], or caus[ing] to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceal[ing] or knowingly and improperly avoid[ing] or decreas[ing] an obligation to pay or transmit money or property to the Government." To establish a violation of this subsection, "a plaintiff must show: (1) proof that the defendant made a false record or statement (2) at a time that the defendant had a presently-existing obligation to the government—a duty to pay money or property." *Kester*, 2014 WL 2619014, at *10 (quotation marks omitted).

Thomas argues that he adequately alleged reverse false claims because the Amended Complaint asserts that Premier received "government funds to which it was not entitled" and that constitutes "'overpayments' and thus 'obligations' under the FCA." (Opp. at 22 (citing 31 U.S.C. § 3729(b)(3)).) The Second Circuit, however, has concluded that reverse false claims cannot be premised on the same conduct underlying a traditional false claim. *United States ex rel. Foreman v. AECOM*, 19 F.4th 85, 120 (2d Cir. 2021). Because Thomas's reverse false claims mirror his false claims under § 3729(a)(1)(A) and (B), he fails to state a plausible cause of action. *Id.*

### C. Violations of the FCA Retaliation Provision 31 U.S.C. § 3730(h)(1)

Under the FCA's retaliation provision, "[a]ny employee" shall be entitled to relief where they are "discharged, demoted, suspended, threatened, harassed, or in any other manner discriminated against in the terms and conditions of employment" in connection with their "efforts to stop 1 or more violations of" the FCA. *Chorches*, 865 F.3d at 95 (citing 31 U.S.C. § 3730(h)(1)). In order to plead a claim of retaliation under the FCA, a relator generally is required to show that "(1) he engaged in activity protected under the statute, (2) the employer was aware of such activity, and (3) the employer took adverse action against him because he engaged in the protected activity." *Chorches*, 865 F.3d at 95. Unlike the fraud provisions of the FCA, "[a] plaintiff need not plead an FCA retaliation claim with particularity because no showing of fraud is required." *N. Adult Daily Health Care Ctr.*, 205 F. Supp. 3d at 297.

To satisfy the first element, a plaintiff must allege that he engaged in conduct that is protected by the FCA. Here, Thomas fails to do so. First, Thomas's conduct was not "directed at exposing a fraud upon the government." *Fisch v. New Heights Acad. Charter Sch.*, No. 12-CV-2033, 2012 WL 4049959, at *5 (S.D.N.Y. Sept. 13, 2012) (quotation marks omitted). At

12

most, his discussions with and presentations to Premier leadership involved reporting compliance violations that might have affected billing, but his actions were not directly aimed at uncovering fraud. *See generally Koshy v. Regeneron Pharms., Inc.*, No. 17-CV-7781, 2019 WL 6895563, at *6 (S.D.N.Y. Dec. 18, 2019) (observing that simply "grumbling to the employer about . . . regulatory violations does not constitute protected activity" (quotation marks omitted)). As "mere investigation of an employer's non-compliance with federal regulations is not enough to constitute protected activity under Section 3730(h)(1)," Thomas's claim fails. *Lawrence v. Int'l Bus. Mach. Corp.*, No. 12-CV-8433, 2017 WL 3278917, at *6 (S.D.N.Y. Aug. 1, 2017) (quotation marks and brackets omitted).

Second, and more detrimental to Thomas's retaliation claim, he fails to show that his activity went beyond the performance of his normal job responsibilities. *See, e.g., New York ex rel. Khurana v. Spherion Corp.*, 511 F.Supp.3d 455, 474 (S.D.N.Y. 2021); *Faldetta v. Lockheed Martin Corp.*, No. 98-CV-2614, 2000 WL 1682759, at *12 (S.D.N.Y. Nov. 9, 2000) (explaining that conduct falling within a plaintiff's ordinary job duties does not constitute protected activity). Because Thomas's role as Director of Quality Compliance was to "conduct[] detailed audits of medical documentation to ensure that services provided to patients were properly documented and billed in accordance with Medicare, Medicaid, and third-party payor requirements" (Am. Compl. ¶ 26), his reports to Premier leadership about compliance violations cannot, as a matter of law, qualify as protected activity under the FCA.

Thomas counters that "[r]eporting possible Medicare and Medicaid fraud . . . including at a quarterly Compliance and Quality Committee meeting, [was] not part of [his] duties as Director of Quality Compliance." (*Id.* ¶ 41.) But the definition of a plaintiff's "normal job responsibilities" is not so narrow. For example, in *Mirza v. Garnet Health*, the court concluded

13

that a trauma surgeon acted within her normal job duties when she expressed concerns to her superiors about fraudulent billing codes and raised issues regarding incorrect charts and billing approvals. *See Mirza v. Garnet Health*, No. 20-CV-556, 2022 WL 826410, at *10 (S.D.N.Y. Mar. 17, 2022). Thomas's position as Director of Quality Compliance—responsible for auditing documentation and ensuring proper billing—aligns even more directly with reporting potential fraud than the surgeon's duties in *Mirza*.

### D. Violations of State Law

Thomas states that this Court has jurisdiction over his state law claims under: (a) 28 U.S.C. § 1331, because the claims arise under federal law; (b) 31 U.S.C. § 3732(b), because the state law claims arise from the same transactions or occurrences as the claims brought pursuant to federal law; and/or (c) 28 U.S.C. § 1367, because his state law claims form part of the same case or controversy as the claims brought pursuant to federal law. (Am. Compl. ¶ 4.) Given that diversity is lacking within the meaning of 28 U.S.C. § 1332, the only bases under which the Court can address Thomas's state law claims are under the grants of jurisdiction pursuant to 31 U.S.C. § 3732(b) or 28 U.S.C. § 1367.

Both § 1367 and § 3732(b) confer federal district courts with *supplemental* jurisdiction over state law claims. *See United States ex rel. Mohajer v. Omnicare, Inc.*, 525 F. Supp. 3d 447, 461-62 (S.D.N.Y. 2021) (holding that § 3732(b) of the FCA provides supplemental jurisdiction to federal district courts for any action brought under the laws of any State to recover funds paid by a state or local government if the action arises from the same transaction or occurrence as an action brought under § 3730); *New York v. Skanska*, No. 18-CV-9367, 2019 WL 3802462, at *4 (S.D.N.Y., Aug. 13, 2019). As a result, "[i]n a *qui tam* suit involving both state and federal claims, once the federal claims are dismissed . . . a Court may then decline to exercise

supplemental jurisdiction over the state-law claims that were related to the federal claim." *Mohajer*, 525 F. Supp.3d at 462.

The Court declines to exercise its supplemental jurisdiction here. Thomas can still bring his state claims in state courts if he chooses to do so. *See One Commc'n Corp. v. JP Morgan SBIC LLC*, 381 Fed. App'x 75, 82 (2d Cir. 2010) (summary order).

### E.      Leave to Amend

Thomas's brief requests leave to amend. (Opp. at 25.) Granting or denying such leave is within the discretion of the district court, and "leave to amend will generally be granted unless: (1) there is evidence of undue delay, bad faith, dilatory motive, or repeated failures to cure deficiencies by amendments previously allowed; (2) allowing amendment would cause undue prejudice to the opposing party; or (3) the amendment would be futile." *Raymond v. City of New York*, 317 F. Supp. 3d 746, 759 (S.D.N.Y. 2018). Premier opposes Thomas's request. (ECF No. 28 at 7, 12, 13, 15.)

On June 10, 2025, Premier moved to dismiss Thomas's original complaint on the grounds that the factual allegations were insufficient to meet the requisite pleading standard. (ECF Nos. 12, 13.) Premier sought dismissal with prejudice considering the identified deficiencies. (*Id.*) In response, Thomas filed the operative Amended Complaint, which included certain amendments presumably in an effort to address the alleged inadequacies. (Am. Compl.) As discussed above, the new Amended Complaint fails to plausibly allege FCA violations. Given the dearth of factual, as opposed to conclusory, allegations in support of these claims, Thomas's acknowledgement that he lacks personal knowledge of any specific false claims submitted to the government, and because Thomas has already attempted to amend his complaint once to plausibly allege FCA violations, the Amended Complaint is dismissed with prejudice. *See, e.g.*,

*United States ex rel. Ladas v. Exelis, Inc.*, 824 F.3d 16, 28-29 (2d Cir. 2016) (affirming dismissal with prejudice and denial of leave to amend where relator "was fully aware of the Rule 9(b) challenges to his pleading," yet his second amended complaint "failed to cure the . . . deficiencies"); *Grabcheski v. Am. Int'l Grp., Inc.*, 687 F. App'x 84, 88 (2d Cir. 2017) (affirming dismissal with prejudice and denial of leave to amend where there "is no excuse for a repeated failure to plead a plausible FCA claim with particularity"); *Chapman v. Off. of Child. & Fam. Servs. of New York*, 423 F. App'x 104, 105 (2d Cir. 2011) (affirming dismissal with prejudice where "[t]he present record indicates that under the theories presented in [the] complaint, [relator] will never be able to plausibly allege that [d]efendants committed fraud").

### IV.     Conclusion

For the foregoing reasons, Premier's motion to dismiss is GRANTED.  The Clerk of Court is directed to terminate all open motions, to enter judgment of dismissal, and to close this case.

SO ORDERED.

Dated: October 27, 2025
       New York, New York

_____
J. PAUL OETKEN
United States District Judge